JACKSONVILLE TERMINAL COMPANY, Appellant,

v.

RAILWAY EXPRESS AGENCY, INCORPORATED, Appellee.

No. 18868.

United States Court of Appeals Fifth Circuit.

Nov. 17, 1961.

Rehearing Denied Jan. 11, 1962.

---

Elliott Adams, Jacksonville, Fla., Mc-Carthy, Adams & Foote, Jacksonville, Fla., of counsel, for appellant.

John S. Cox, Jacksonville, Fla., Cox, Grissett, MacLean & Webb, Jacksonville, Fla., of counsel, for appellee.

Before TUTTLE, Chief Judge, and JONES and WISDOM, Circuit Judges.

TUTTLE, Chief Judge.

Jacksonville Terminal Company (JTC), appeals from a judgment of the trial court, entered upon the jury's answers to three interrogatories, rejecting its claim for indemnity against the defendant, Railway Express Agency (REA).

JTC was the lessor and REA the lessee of railway terminal property in Jacksonville, Florida. The lease contained the following provisions:

"5. It is further agreed that all of the railway tracks constructed upon the land hereby leased and demised * * * shall be constructed and maintained by the Terminal Company according to its standard, but cost of such construction and maintenance shall be paid for by the Express Company, provided, however, that the Terminal Company shall construct and maintain at its expense all railway tracks necessary to afford proper connections to railway tracks aforesaid, and the Terminal Company shall operate all the said railway tracks."

"9. Inasmuch as the station facilities are operated and maintained for the joint and common use of all Railway Companies using the Jacksonville Terminal Company's station and property, it is hereby expressly stipulated that the said Express Company will fully indemnify and save harmless the said Terminal Company and the Railway Companies using the Terminal Company's station and property from and against all charges, expenses, loss, damage, injuries, suits, or judgments, arising by reason of or in connection with occupation and use of the premises of the Terminal Company by the Express Company under this agreement, whether to the property of, or persons in employ of, the Terminal Company * * *"

On March 9, 1954, one Johnson, a switchman employed by JTC, suffered a back injury while working in a yard consisting of a system of railroad tracks used for switching express cars. Although the yard was leased to REA by JTC, it was maintained and operated by JTC in accordance with Paragraph 5 of the lease. The cars upon which Johnson was working had already been loaded by REA with express matter, and were on a spur or storage track in the leased yard. Johnson was engaged in classifying and taking out the cars which were to be incorporated in an outgoing train.

At the time of his injury, Johnson was aligning a draw bar on one of the cars so that it would couple upon impact with another car. The injury resulted from his stepping on a rotten crosstie which caused his foot to slip down into a hole approximately 6 to 8 inches deep and 12 to 14 inches wide alongside the crosstie.

Johnson was compensated for his injury in the following manner: JTC provided him with medical services and paid for his lost time, amounting to $18,917.89. Johnson then sued JTC in a state court under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., and Federal Safety Appliances Act, 45 U.S.C.A. § 1 et seq. REA rejected JTC's demand to defend Johnson's action, and Johnson thereafter recovered a judgment against JTC for another $43,483.08.

JTC then brought this suit, claiming that, under paragraph 9 of the lease, REA was required to indemnify JTC for the above expenses, plus the expense of defending Johnson's state court action. The total claimed was $68,062.62.

REA resisted this suit on the following principal grounds: First, that the injury did not arise "by reason of or in connection with occupation and use of the premises of the Terminal Company by the Express Company" within the meaning of paragraph 9 of the lease; second, that the injury was caused solely by JTC's negligence in failing to maintain the storage track in a safe and proper condition; and third, that the injury was caused solely by JTC's breach of its contractual duty, under paragraph 5 of the lease, to maintain the track "in accordance with its standard."

·With respect to the meaning of the indemnity clause (Paragraph 9), the trial court charged the jury as follows:

"Now, the question then is, that you must answer here, is whether or not this loss and damage * * * arose by reason of or in connection with the occupation and use of these premises by the Express Agency, or did it arise from some other reason? The plaintiff has the burden of showing that it arose by reason of the occupation and use of the premises by the Express Agency.

"Now, in that framework you are required under this first question to decide whether or not these injuries and the incident loss and expenses * * * arose by reason of or in connection with the occupation and use that the Express Company was there, or they arose from some other reason; that is, if they arose from the occupation and use of the premises by the Terminal Company and not by reason of or in connection with the use and occupation of the premises by the Railway Express Company, why then, of course, you would answer that question in the negative.

"If you find from a preponderance that they did arise by reason of the use and occupation * * * of the leased premises by the Express Agency, you should answer that question in the affirmative."

The trial court further instructed the jury to return a verdict for REA if it found that Johnson's injury was caused by JTC's negligence or breach of contract in failing to maintain the storage track in a safe and proper condition. In other words, the court construed the indemnity clause as not protecting JTC from losses due to its own negligence or failure to perform satisfactorily its obligations un-

der other provisions of the lease agreement.

In accordance with these instructions, the jury returned a verdict for REA, finding (1) that Johnson's injury did not arise "by reason of or in connection with occupation and use of the premises of the Terminal Company by the Express Company," and (2) that the injury was caused by JTC's negligence and breach of contract in failing to maintain the storage track in a safe and proper condition.

In resolving the issues presented by this appeal, there are two preliminary points which must be kept in mind. First, since the lease agreement was made and performed in Florida, it is clear that the law of that state controls as to the construction and validity of the indemnity clause.[1] Pacific Portland Cement Co. v. Food Machinery & Chemical Corp., 9 Cir., 178 F.2d 541; second, it is also ·clear that, in Florida, as elsewhere, the cardinal rule of construction is to ascertain the intention of the contracting parties and to give effect to that intention if it can be done consistently with legal principles. St. Lucie County Bank & Trust Co. v. Aylin, 94 Fla. 528, 114 So. 438. Where the language chosen by the parti^s, given its ordinary and natural meaning, unambiguously manifests that intention, the judicial task is at an end. McGhee Interests v. Alexander National Bank, 102 Fla. 140, 135 So. 545.

With these propositions in mind, we conclude that the judgment below was erroneous, and that a judgment should have been entered in favor of the plaintiff-appellant, JTC, for the amount claimed.

An examination of the trial court's instructions reveals a failure to stress or

---

1. Since the clause merely provides for indemnification and does not purport to limit JTC's liability to its employees, under the Federal Employers' Liability Act or the Federal Safety Appliance Act, the clause is not void under 45 U.S.C.A. § 55. Chicago & N. W. Ry. Co. v. Davenport, 5 Cir., 205 F.2d 589. Further, since JTC did not contract in the capacity of a common carrier subject to the provisions of the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., the indemnity clause is not void as being contrary to the spirit and provisions of that Act. Cf. Chicago & N. W. Ry. Co. v. Davenport, supra.

explain what we think is the crucial language in the indemnity clause. The court emphasized the phrase "by reason of," which, given its ordinary and natural meaning, implies a need for some sort of a causal relationship between REA's occupation and use of the premises and the resultant injury. On the other hand, the court minimized the significance of the phrase "in connection with," which does not ordinarily refer to causal connection; and there is no indication that the parties intended this phrase to convey other than its ordinary meaning in the context of the indemnity clause.

Moreover, the jury was instructed to consider whether the loss "arose from the occupation and use of the premises by the Terminal Company and not by reason of or in connection with the use and occupation of the premises by the Express Company." This clearly implies that if the loss arose by reason of JTC's use and occupation of the premises, it could not have arisen in connection with REA's use and occupation of the premises. In our view, these elements were not mutually exclusive. We fail to see why the injury could not have arisen by reason of JTC's use and occupation of the premises and still have arisen in connection with REA's business on the premises.

The Supreme Court of Florida has interpreted the phrase, "in connection with" in the following manner:

"The words, 'in connection with that company's railways' as used in relation they bear to the whole clause, are equivalent of 'in the interest and upon the employment of that company in and about its railways and the operation and management thereof, and all matters connected with, relating to, and growing out of the proper and legitimate business of the company as the possessor and operator of such railways." J. Ray Arnold Lumber Corporation of Olustee v. Richardson, 105 Fla. 204, 141 So. 133, 135.

■ Giving this phrase the meaning attributed to it by the Florida Supreme Court, we find no escape from the conclusion that Johnson's injury arose "in connection with" the occupation and use of the terminal premises by REA. Even though the Express yard was maintained and operated solely by JTC, it is clear that Johnson's job of incorporating the fully loaded express cars into an outgoing train "grew out of the proper and legitimate business" which REA conducted on the Terminal premises. As JTC points out in its brief:

"The injury to Johnson occurred on the premises occupied by the Express Company under the lease containing the indemnity clause. Johnson was performing a switching movement in the operation of the tracks under the provisions of the lease for the account of the Express Company, and the switching movement constituted an essential element to the conduct of the Express Company's business, which includes forwarding of express matter."

■ In the undisputed facts touching on this point, we think the trial court should have itself concluded that Johnson's injury arose "in connection with" REA's occupation and use of the premises. The submission of this question of contract construction to the jury was therefore unwarranted. Solary v. Stultz, 22 Fla. 263.

Having concluded that Johnson's injury and the consequent loss arose in connection with REA's occupation and use of the premises, we must next decide whether REA's contract to indemnify JTC against liability for "all losses, etc." so arising was meant to include losses resulting from JTC's negligence. In other words, we have already determined that Johnson's injury was *physically* connected with REA's business on the premises. We now turn to the question whether the parties intended the indemnity clause to apply to all losses so connected, or whether they meant it to be inapplicable to losses caused by the negligence of the indemnitee, JTC.

At first glance, this would not seem to present a difficult problem of interpretation, for given its ordinary and natural meaning, the word "all" leaves no room for exceptions. Since, absent extraordinary circumstances, we are bound to interpret a contract in accordance with the natural and ordinary meaning of the language employed therein, there would appear to be no alternative to the conclusion that, under Paragraph 9 of the lease, REA was obligated to indemnify JTC for losses due to the latter's negligence.

Unfortunately, however, the solution is not so simple. We are faced with numerous cases wherein it has been held that a promise to indemnify for "all losses, etc." will not relieve the indemnitee from liability for losses caused by his own negligence. Apparently, the theory underlying these decisions is that the assumption of this liability is such an "unusual" and "hazardous" undertaking, that there can be no presumption that the indemnitor meant to assume it absent explicit reference to the indemnitee's negligence in the contract. Indeed, this is perhaps the majority, although far from a universally accepted, rule.[2]

Appellee claims, and the District Court agreed, that the courts of Florida have adopted the majority view. In support of this contention, appellee cites Jackson et al. v. Florida Weathermakers, 55 So. 2d 575 (Fla.1951). In that case, the court rejected a plea for indemnity for loss due to the indemnitee's negligence where the plea was based merely on the indemnitor's promise to procure "public liability insurance." The court stated that the contract, "in the absence of clear and unequivocal terms must be construed to be a contract to indemnify only against the negligence of the indemnitor, and not that of the indemnitee"

It is apparent that there is nothing in the Jackson case which justifies appellee's contention. No promise to indemnify against "all losses, etc." was involved there; and the statement that the contract must clearly and unequivocally manifest the parties' intention to absolve the indemnitee from liability for losses caused by his own negligence is entirely consistent with those cases which have held that broad language of the kind under consideration here *is* such a clear and unequivocal manifestation. See e. g. Griffiths v. Henry Broderick, Inc., 27 Wash.2d 901, 182 P.2d 18, 175 A.L.R. 1.

The other cases involving Florida law on this point also fail to support the position for which appellee contends.

In Ringling Bros. Barnum & Bailey Combined Shows, Inc. v. Olvera, 119 F.2d 584, 587 (9th Cir., 1941), the court interpreted Florida law as protecting a circus from the consequences of its own negligence where a circus performer had released the circus from all liability "growing out of any injury or accident to the person and/or property of the Artist in any transaction whatsoever during the period of performance under this contract * * *." Now, although this case involved a release provision rather than a true indemnity clause, in a very real sense it presented much the same issue as presented in the indemnity case, viz., interpretation of a contractual provision purporting to absolve a party from liability for loss caused by his own negligence. The court rested its decision on a number of Florida cases holding that it is not against public policy for an indemnitee to contract himself out of liability for damage resulting from his own negligence.

In Thomas v. Atlantic Coastline R. Co., 201 F.2d 167, 169 (5th Cir. 1953), the indemnitor had agreed to indemnify the railroad for all damage "whether the same is the result of fire caused by negligent emission of sparks from the locomotive engines of Lessor, or otherwise, however resulting." The damage at issue had been caused by the negligence of the railroad's employees in failing to extinguish a fire which they had kindled adjacent to the railway track. The court, purporting to apply Florida law, held that the damage was included within the

---

**2.** See the discussion in 27 Am.Jur.Indemnity Section 15.

coverage of the indemnity clause, stating:

"We think in view of the surrounding circumstances and of the express provision in the contract that the privilege accorded by the lease shall be enjoyed solely at the risk of appellant, that it was unquestionably the intention of the contracting parties to exempt appellee railroad from liability for ordinary negligence in respect to all claims from fire regardless of origin or however resulting."

In Russell v. Martin, 88 So.2d 315, 317 (Fla. 1956), the indemnitor had agreed "to indemnify and save harmless, the Railroad from any and all claims arising out of the use of said (railway) crossing; that he (Russell) would use said crossing at his own risk and would not rely on the Railroad * * * for signals or warnings of approaching trains." The damage complained of was allegedly caused in part by the railroad's running a train at a "high and dangerous" speed in violation of a town ordinance. The damage occurred at the involved crossing, and it was alleged that the railroad was negligent in failing to signal the train's approach. Though the negligent act of running the train at a "high and dangerous" speed in violation of the ordinance was not expressly covered by the indemnity clause, the court held that it was included within the scope of the clause's protection.

■■ While all the above cases are factually distinguishable from the instant case, it seems clear that they do not adopt the majority view requiring the indemnity contract to contain an express stipulation relieving the indemnitee from liability for loss resulting from his own negligence. Consequently, in construing paragraph 9 of the lease, we are unfettered by any rule of construction which would require us to do violence to the plain and clear meaning of the language employed therein. And, left to traditional rules of construction, we do not hesitate to conclude that REA's promise to indemnify JTC for "all losses, etc." clearly and unequivocally manifests an intention to absolve JTC from liability for all losses, including those caused by its own negligence.

Appellee would have us apply the majority rule notwithstanding that we are not bound to do so under the law of Florida. Having found what this Florida law is we do not feel that we have the right to do so. However, if we had that option, it is appropriate to say that we would be more receptive to this suggestion if we felt that application of that rule would produce benefits outweighing the harm caused by any departure from the obvious meaning of the language chosen by the parties. But we do not think this is the case. In our view, the majority rule rests on an unsound and dangerous foundation.

It presumes, first of all, that one party's assumption of liability for losses due to another's negligence is an "unusual" and "hazardous" undertaking. We cannot agree. In the light of modern conditions, we perceive little justification for so characterizing the indemnitor's obligation. Insurance companies assume this obligation every day, especially in connection with automobile liability policies. And, it is common knowledge that the device of insuring against one's own negligence through indemnity contracts is frequently employed in other business ventures.

Perhaps more important, even assuming that the burden imposed on the indemnitor is "unusual" or "hazardous", the majority rule presumes that courts have the power to alleviate or eliminate this burden by construing the indemnity agreement in a manner which is patently inconsistent with the plain and clear meaning of the language employed by the contracting parties. This is a dangerous and unwarranted extension of the judicial function. If a court feels that a contract imposes an extraordinary liability on one of the parties, it may, in certain instances, pronounce the contract void as

being contrary to public policy.[3] But where, as here, a contract does not violate public policy, we have no authority to achieve the same result by concluding that the parties did not really mean what the unambiguous language of their agreement imports.

There was no mistake of fact or law which induced either of the parties to enter into this contract. There was no fraud or duress. The parties were admittedly of equal bargaining power. Indeed, REA itself drafted the terms of the indemnity clause. In this situation, we must adhere to the wise and well established principle that the court will not make a contract for the parties. REA freely consented to indemnify JTC for "all losses, etc." arising in connection with its use and occupation of the terminal premises. It did not see fit to exclude losses caused by JTC's negligence. It cannot now complain of the consequences.[4]

We conclude, therefore, that the trial court erred in refusing to strike REA's defense based on JTC's alleged negligence in failing to maintain the storage track in a safe and proper condition.

We are aware that, at least on the surface, our conclusion is inconsistent with this Court's recent decision in Bat-

son-Cook Co. v. Industrial Steel Erectors, 5 Cir., 257 F.2d 410. However, since we there purported to apply Alabama law in construing the Alabama Contract,[5] that case has no effect on our interpretation of the instant contract, which is controlled by the law of Florida.

■■■ For much the same reasons, there is no merit in the contention that the indemnity clause does not protect JTC against liability for loss due to the alleged breach of its contractual duty, under paragraph 5 of the lease, to maintain the storage track "in accordance with the standard". The indemnity clause contains no exception for such loss, and we are powerless to add one.

■■■ Moreover, it is apparent that paragraph 5 and paragraph 9 of the lease are independent covenants, the breach of one having nothing to do with the enforceability of the other. This is familiar and settled law, and the point requires no elaboration here. Zambetti v. Commodores Land Co., 102 Fla. 586, 136 So. 644; Houston & Texas Central R. Co. v. Diamond Press Brick Co., 111 Tex. 18, 222 S.W. 204, 226 S.W. 140. Since JTC's alleged breach of paragraph 5 was no defense to its assertion of REA's liability under paragraph 9, we hold that the trial court erred in refusing to strike REA's

3. To be sure, until recently, a majority of courts held that an indemnity contract purporting to absolve the indemnitee from liability for his own negligence was void as against public policy. This view has long since been rejected in all but a few jurisdictions. See 27 Am.Jur. Indemnity, Section 9. Russell v. Martin, 88 So.2d 315 (Fla.1956).

4. In fact, with all deference to the Courts that have concluded that an agreement to protect a person from liability for his own negligence is unusual or hazardous, it really appears that this would be the ordinary and normal purpose for an indemnity agreement such as we have before us. In the generality of cases the indemnitee (here JTC) does not have any concern for being indemnified against claims or judgments against the indemnitor (here REA) unless the indemnitee is in danger of being held liable for damages in favor of such claimant or judgment creditor. Normally no such hazard would arise un-

less the indemnitee becomes liable to such claimant because of its negligence or violation of a statutory duty, since the rule of no liability without fault is the general rule. Thus, it would seem that the purpose of taking such an indemnity agreement is generally to put at rest once for all the question whether indemnitee can be made to respond to injured parties for its actions which might be found to result from its fault.

5. It is significant, however, that in Republic Steel Corp. v. Payne, 132 So.2d 581, 586, decided on June 29, 1961, the Supreme Court of Alabama took a position which appears to be inconsistent with the majority rule which was followed in Batson-Cook. In construing a covenant of release of liability of the grantors in sale of land, the Alabama Supreme Court held that a release "from *any* and *all* claims for damages and *all* liability" included a release from a claim based on the negligence of the grantor itself.

defense based on JTC's alleged breach of contract.

Having concluded that the expenses attendant upon Johnson's injury came within the scope of REA's promise of indemnity, and there being no dispute as to the correctness of JTC's computation of these expenses, we reverse the judgment below and direct that a judgment be entered in favor of JTC for $68,062.62.

Reversed.